# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Water's Edge at Wind Gap, LLC     :
                 Appellant     :
                                 :
            v.                 :     No. 279 C.D. 2024
                                 :
Zoning Hearing Board of Moore      :
Township and Moore Township      :     Submitted: July 25, 2025[1]


BEFORE:    HONORABLE ANNE E. COVEY, Judge
                HONORABLE MATTHEW S. WOLF, Judge
                HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge

## OPINION NOT REPORTED

MEMORANDUM OPINION BY
JUDGE WOLF                            FILED: December 31, 2025


Water's Edge at Wind Gap, LLC (Applicant) appeals from the Northampton County Common Pleas Court's (Common Pleas) March 4, 2024 order affirming the March 17, 2023 decision of the Moore Township (Township) Zoning Hearing Board (Board, and with the Township, Appellees) that denied Applicant's appeal from determinations of the Township's Zoning Officer (Zoning Officer). Applicant presents three issues for this Court's review: (1) whether manmade steep areas on its property are subject to the steep slope provisions of the Township's Zoning Ordinance (Zoning Ordinance); (2) whether the Board erred in requiring

---

[1] The parties presented oral argument in this matter before the above-captioned panel of Judges on April 8, 2025. Following argument, this Court remanded the matter to the Court of Common Pleas of Northampton County, retaining jurisdiction, for an evidentiary hearing and determination as to timeliness. *Water's Edge at Wind Gap, LLC v. Zoning Hr'g Bd. of Moore Twp.*, (Pa. Cmwlth., No. 279 C.D 2024, filed May 13, 2025), 2025 WL 1378370 (*Water's Edge I*). After proceedings on remand, return of the record to this Court, and supplemental briefing by the parties, the merits are ripe for disposition.

offsite improvements, as defined by the Pennsylvania Municipalities Planning Code (MPC);[2] and (3) whether the Board erred in denying Applicant's request for a dimensional variance from the Zoning Ordinance. Initially, on the record made on remand in *Water's Edge I*, we determine that Applicant's appeal to the Board was timely filed, vesting the Board with jurisdiction. On the merits, we conclude that the Board correctly applied the Zoning Ordinance's steep slope provisions, but that it erred in requiring impermissible offsite improvements and in denying the requested variance for the reasons it gave. Before we can fully dispose of Applicant's variance request, further factfinding by the Board is warranted. Accordingly, we affirm Common Pleas' decision in part, reverse in part, and vacate and remand in part.

## I. BACKGROUND

Applicant owns the 51-acre property known as 235 Moorestown Drive in the Township (Property). Prior owners developed an 18-hole golf course on the Property about 30 years ago, which remains today. Applicant plans to redevelop the Property as an industrial development with two warehouses.

Applicant submitted a preliminary land development application. On August 2, 2021, the Township's engineering firm, Keystone Consulting Engineers (Keystone) issued a first technical review letter detailing various deficiencies under the Zoning Ordinance. Applicant submitted a revised preliminary land development application on December 8, 2021 (Application). This included an initial site plan (Site Plan 1).

On January 24, 2022, Keystone issued a second review letter. It determined, consistently with the first review letter, that Applicant had not identified

---

[2] Act of July 31, 1968, P.L.805, *as amended*, 53 P.S. §§ 10101-11202.

all areas of steep slopes as required under the Zoning Ordinance and ordered revision to Site Plan 1 to show all steep slopes, whether manmade or preexisting. After receiving the second review letter, Applicant communicated with the Township's solicitor, inquiring whether Keystone's determinations in the letter constituted formal action by the Zoning Officer. Reproduced Record (R.R.) at 392a-93a. Upon being informed they were the Zoning Officer's determinations, Applicant filed an appeal to the Board on April 13, 2022. The appeal included Applicant's substantive validity challenges to several provisions of the Zoning Ordinance and the Township's Subdivision and Land Development Ordinance (SALDO).

While that appeal was pending, Applicant submitted revised and supplemental materials: an amended site plan on October 17, 2022 (Site Plan 2), revised zoning compliance plans on November 21, 2022 (Concept Plan) and a modification of its requested relief on December 26, 2022. *See* R.R. at 73a-85a (modifications to relief).

The Board conducted hearings over six days from July 2022 through February 1, 2023. Applicant presented the testimony of Stephen Walsh, P.E., its engineer. Walsh described the Property as being surrounded by residential lots and two roads, Moorestown Drive and Jones Road. He explained that because it was developed as a golf course, the Property contains many non-contiguous steep areas that were created when the golf course was developed. These include "bunkers," "planting beds," "[s]and traps, tee boxes, [and other] areas that they have flattened out and firmed up" to develop the golf course. R.R. at 502a-03a. Those areas would be "deleted" or filled in to regrade the Property at a consistent slope as shown on Site Plan 2 so the two warehouses, parking areas, and access roads could be built. *Id.* at 503a-04a. He conceded that Site Plan 2 does not depict all areas that would

qualify as steep slopes under the Zoning Ordinance (i.e., areas with a grade above 8%) because many of those areas on the Property are manmade and were thus not depicted on the plan.

Walsh addressed traffic concerns, explaining that the two warehouses combined would employ nearly 1,000 people and operate 44 loading docks. He stated his view that despite that traffic, the Township cannot require Applicant to make improvements to Jones Road because it is not part of the Property and will not be used to access the Property per the current design, and a previously planned emergency access via Jones Road had been removed from the design. Walsh also testified regarding the need for a dimensional variance because, in order to build a 100-foot-wide raised berm along Jones Road as required under the Zoning Ordinance, Applicant cannot preserve the existing woodlands on the Property at the rate the Zoning Ordinance requires.

The Township presented the testimony of Kevin Horvath, its engineer, who is employed by Keystone. He expressed concern for traffic and stated that Applicant had not provided clear justification for its estimations of those impacts. He confirmed that Applicant had not identified all steep slope areas as part of the Application and clarified that the Zoning Ordinance's steep slope provisions differ from the separate steep slope provisions of the SALDO. Horvath testified that, in his view, the Zoning Ordinance's steep slope provisions can apply to manmade features as well as preexisting ones.

Finally, the Township presented the testimony of Jason Harhart, the Zoning Officer. He generally testified that the Application was insufficiently specific regarding the identities of potential tenants of the warehouse project, the precise nature of the use, and the traffic, parking, and environmental impacts. The

4

Zoning Officer testified that, like Horvath, he views the Zoning Ordinance's steep slope provisions as potentially applying to manmade features.

On February 10, 2023, the Board voted orally to deny the Application. Its written decision followed on March 17, 2023. The Board described the modifications Applicant had made to its requested relief via Site Plan 2, including the contingent withdrawal of its substantive validity challenges regarding dedication of open space and off-site improvements if the Board were to grant relief on the other substantive validity challenges and variances. *See* R.R. at 992a-94a, 1006a-07a. The Board made the following relevant conclusions of law regarding the Zoning Ordinance's steep slope provisions:

> 82. Neither [Site Plan 2], nor any other plan depicting slopes . . . submitted by Applicant, identify or provide information related to the protection rate of steep slopes in 8-15% and 15-25% increments as required by the [Z]oning [O]rdinance.
>
> . . . .
>
> 93. The hills, mounds, berms, traps and other slopes created for the golf course have been in existence for approximately thirty (30) years and no evidence has been presented that they exist today with the assistance of artificial means. The hills, berms, traps and other slopes are the natural features of the [Property] as it exists today.
>
> . . . .
>
> 95. The Board finds that the Zoning Officer's application of [the Zoning Ordinance's steep slope provisions to the Property] was not arbitrary and unreasonable.
>
> . . . .
>
> 101. The Board further notes that the Applicant did not request a variance [from steep slope provisions] despite

5

clearly claiming the manmade features create a hardship that inhibit his ability to comply with the ordinance.

*Id.* at 1012a-14a (emphasis omitted). Regarding offsite improvements, the Board concluded:

> 142. The Board finds that the Zoning Officer's and Engineer's application of the [SALDO] provisions related to improvements to Jones Road was not arbitrary or unreasonable.
>
> 143. All plans that have been submitted by Applicant as evidence in this appeal depict the improvements to Jones Road.
>
> 144. Additionally, Site Plan 1 clearly depicts an emergency access road that Applicant intends to construct to provide emergency vehicle access to the [Property].
>
> 145. Applicant further agreed that tractor trailers may attempt to access the [Property] via Jones Road beyond Applicant's control.
>
> 146. The size and scope of the proposed development, significant increase in traffic and potentially dangerous configuration of Jones Road reasonably warrant the improvements to Jones Road and application of the challenged [SALDO] provisions.

*Id.* at 1023a. Regarding variance relief, the Board concluded:

> 147. . . . . Applicant seeks a five percent (5%) variance from [the Zoning Ordinance's woodland preservation requirement of 60%].
> . . . .
>
> 153. The Board denies Applicant's request for a variance for the following reasons:
>
>> a. Applicant has not met his [sic] burden of proof to demonstrate the requisite hardship.

6

b. Applicant has created the necessary 5% variance due to the size of the proposed warehouse structures. Applicant has the clear ability to reduce the size or number of proposed warehouses, which would allow for the preservation of at least 60% of the woodland areas as the ordinance requires.

c. The [Property] is large enough to allow for Applicant to use the [Property] for the permitted warehouse use, while also allowing for the required preservation rate of the woodland areas.

d. The proposed development is completely altering the essential character of the neighborhood. The [Property] is currently used as a golf course and is primarily surrounded by large, single-family homes. The size of the proposed structures, potential for 24-hour commercial activity and increase in traffic will dramatically transform the neighborhood from mostly residential to an intense industrial space.

e. Furthermore, Applicant's request is not the minimum variance that will afford relief and represent the least modification of the ordinance. As stated above. Applicant maintains full control over the size of the proposed structures. Applicant can certainly construct a warehouse or warehouses that would not require any relief or, at the very least, less than the 5% preservation rate requested.

*Id.* at 1023a-26a. The Board made other determinations that are not at issue on appeal, finding the Application insufficiently specific and upholding the assessment of a monetary open-space fee for the development. *Id.* at 1017a-21a.

Applicant appealed to Common Pleas, which affirmed in part and reversed in part. It reversed the Board's decision on the specificity of the Application (where Common Pleas determined that the Application provided sufficient information under the Zoning Ordinance) and the open space fee (where it concluded there is no reasonable relationship between the open space fee and the

7

development's impacts).  On all other issues, Common Pleas affirmed the Board.

## II.  ISSUES

On appeal,[3] Applicant raises three issues.  First, Applicant argues the manmade golf course features on the Property cannot be considered steep slopes under the Zoning Ordinance.  In support, Applicant claims the manmade features of the Property are neither "natural resources" nor increasing erosion, so they do not meet the Zoning Ordinance's definition of steep slopes.  It also suggests a conflict between the steep slope provisions of the Zoning Ordinance and the SALDO, which it argues should ease the Zoning Ordinance's requirements.   In its second issue, Applicant argues the Board erred in requiring offsite improvements to Jones Road. Third, Applicant argues the Board erred in denying variance relief because the Property's unique features prevent it from satisfying the woodland protection requirement and the raised-berm buffer requirement simultaneously.

## III.  DISCUSSION

### A.  Timeliness of Appeal to Board

We first address whether Applicant's appeal to the Board was timely, which determines whether the Board had subject matter jurisdiction to hear this appeal. *Martin v. Zoning Hr'g Bd. of W. Vincent*, 230 A.3d 540, 545 (Pa. Cmwlth. 2020).  In *Water's Edge I*, we explained that the 30-day period for appeal to the Board under the MPC begins with notice of a determination by a zoning officer. *Water's Edge I*, slip op. at 3-4 (citing Sections 615 and 914.1(b) of the MPC, 53 P.S. §§ 10615, 10914.1(b)).[4]  We described the timeliness issue as follows:

---

[3] Where, as here, common pleas does not take additional evidence, our review is limited to determining whether the Board abused its discretion or erred as a matter of law. *Bird v. Zoning Hr'g Bd. of Mun. of Bethel Park*, 320 A.3d 843, 848 n.8 (Pa. Cmwlth. 2024).

[4] Section 914.1 of the MPC was added by the Act of December 21, 1988, P.L. 1329.

A "determination" is "final action by an officer, body or agency charged with the administration of any land use ordinance." Section 107(b) of the MPC, 53 P.S. § 10107(b). Conversely, a letter from a zoning officer or other person *to the municipality*, rather than to the applicant, and which is merely made to "assist[t] the recipient in the rendering of any decision," is a "report" rather than a determination and is not appealable. *In re: Appeal of Provco Pinegood Sumneytown, LLC*, 216 A.3d 512, 518 (Pa. Cmwlth. 2019) (quoting Section 107(b) of the MPC, defining "report"). "[T]here is no requirement in the MPC that a determination be in writing." *N. Codorus Twp. v. N. Codorus Twp. Zoning Hearing Bd.*, 873 A.2d 845 (Pa. Cmwlth. 2005). A zoning officer's oral telephonic "statement to [the applicant] that [the ordinance] would apply . . . constitutes a determination" that starts the appeal period. *Id.*; *accord Provco Pinegood Sumneytown*, 216 A.3d at 518-19.

In this case, the January 24, 2022 second review letter from Keystone addressed to the Township does not purport to be a determination of the Zoning Officer. Thus as a matter of law, the letter itself was not appealable to the Board. *Provco Pinegood Sumneytown*, 216 A.3d at 518-19. The subsequent oral communications referenced in testimony before the Board could conceivably constitute a determination of the Zoning Officer, but the present record does not reflect the communications' timing. Because the parties did not raise the timeliness issue below, there is not yet evidence or factual findings about whether or when Applicant received notice of a determination by the Zoning Officer. The date of that notice, which is a factual question, controls when the 30-day appeal period began running and thus whether the appeal to the Board was timely filed.

*Id.*, slip op. at 3-4 (emphasis in original).

On remand, Common Pleas held an evidentiary hearing to determine the date of the Zoning Officer's determination, as we directed. At the hearing, the parties stipulated to much of the relevant timeline, though some disagreement

9

remained.

Marc B. Kaplin, Esquire, counsel for Applicant, testified that on January 27, 2022, three days after the January 24, 2022 second review letter, he had a telephone conversation with the Township's Solicitor where he requested that the Zoning Officer produce a formal written determination. Original Record, Item No. 28 (Notes of Testimony of May 28, 2025 Hr'g (N.T.)) at 32. Attorney Kaplin stated that the Solicitor agreed to supply such a determination but none was produced. *Id.* at 33. Attorney Kaplin testified he called the Solicitor on March 10, 2022, and they discussed that Applicant should attend the upcoming March 28, 2022 meeting of the Township's Planning Commission to obtain the Commission's feedback on the Application. *Id.* at 35. The parties stipulated that co-counsel for Applicant sent a follow-up email to Township officials stating that Applicant would attend the March 28 meeting to determine whether to pursue its intended appeal to the Board. *Id.* A draft copy of Applicant's notice of appeal was attached to the email. *Id.* At the March 28, 2022 meeting, the Planning Commission advised Appellant that it would not address "any of the review comments pertaining to the [Z]oning [O]radiance, and all such questions needed to be presented to the Zoning Hearing Board." *Id.* at 37.

Zoning Officer Harhart testified that he did not issue a written determination on the Application. N.T. at 53-54, 71. He conceded that the approval process initiated by the Application continued until the March 28, 2022 Planning Commission meeting, and did not end before that point. *Id.* at 72. On cross-examination and questioning by the court, the Zoning Officer could not identify a point in time when he made a final determination, orally or in writing, on the Application. *Id.* at 72-76. He stated there was no "final date . . . because it is an ongoing land development review." *Id.* at 76.

Following the hearing, Common Pleas credited Attorney Kaplin's testimony regarding his requests for a written decision of the Zoning Officer, which was never produced. O.R., Item No. 27, Findings of Fact (F.F.) 7-8, 10-12. Dispositively, Common Pleas found as fact:

> 19. In light of the fact that the parties voluntarily engaged in a process of submissions and resubmissions as well as discussions designed to effectuate an agreement as to the land development plan up to March 28, 2022, which encompasses the zoning issues, March 28, 2022 is the date that the process ended thereby making the Zoning Officer's determination final.

*Id.* F.F. 19. That finding is supported in the record made on remand and the Township apparently does not dispute it.[5] Applicant filed its appeal to the Board on April 13, 2022, within 30 days of March 28, 2022. We are satisfied that Applicant's appeal to the Board was timely filed and turn now to the merits.

### B. Steep Slopes

Applicant's first issue involves the proper interpretation of the Zoning Ordinance, which is a question of law. *Northampton Area Sch. Dist. v. Zoning Hr'g Bd. of Twp. of Lehigh*, 64 A.3d 1152, 1157 (Pa. Cmwlth. 2013). We construe a zoning ordinance the same way we would a statute, applying the Statutory Construction Act of 1972.[6] *Kohl v. New Sewickley Twp. Zoning Hr'g Bd.*, 108 A.3d 961, 968 (Pa. Cmwlth. 2015). We determine the intent of the enacting body; the plain language of the ordinance is the best indicator of that intent. *Id.*; 1 Pa. C.S. § 1921(b). Thus, "[w]here the words in an ordinance are free from all ambiguity, the letter of the ordinance may not be disregarded under the pretext of pursuing its spirit." *Adams Outdoor Advert., LP v. Zoning Hr'g Bd. of Smithfield Twp.*, 909 A.2d 469, 483 (Pa.

---

[5] *See* Township's Supp'l Br. at 7-8.
[6] 1 Pa. C.S. §§ 1501-1991.

Cmwlth. 2006). "Words and phrases shall be construed according to rules of grammar and according to their common and approved usage[.]" 1 Pa. C.S. § 1903(a).

It is only when the ordinance is unclear or doubtful that we turn to other considerations under the Statutory Construction Act, such as the goal of the ordinance, deference to the zoning hearing board's interpretation, or reading the zoning ordinance *in pari materia* with other ordinances. *See AUUE, Inc. v. Borough of Jefferson Hills Zoning Hr'g Bd.*, 318 A.3d 771, 780-82 (Pa. 2024); *Commonwealth v. Rosario*, 294 A.3d 338, 349 (Pa. 2023).

Applicant presents three arguments for why the Board erred in concluding that the sloped areas of the Property are steep slopes under the Zoning Ordinance. These arguments implicate Section 200-35(B) of the Zoning Ordinance[7]

---

[7] Section 200-35(B) provides in relevant part as follows:

B. Natural resources and protection rates

(1)     The applicant for a subdivision, land development, site plan and/or building permit shall be required to identify *all natural resources* on a lot when submitting an application for a subdivision, land development and/or building permit. This inventory shall include the following resources: floodplains, floodplain soils, wetlands, waters of the United States, waters of the commonwealth, perennial and intermittent watercourses, riparian and wetland buffers, *steep slopes*, and woodlands.

. . . .

(11) Steep slopes.

   (a) Steep slopes shall include areas of 3,000 square feet or greater where the slope exceeds 8%.

   (b) Steep slopes with a grade of 8% to 15% shall have a protection rate of 60%.

**(Footnote continued on next page…)**

12

and associated defined terms.

First, Applicant focuses on the limiting language "natural resources" in Section 200-35(B). It argues that the manmade slope areas on the Property—which Walsh testified include berms, bunkers, sand traps, planting boxes, and other golf course features—are not "natural resources" when that term is properly interpreted. Applicant asserts that some of the areas are covered with asphalt or turf grass. Applicant asserts a distinction between "natural resources," as used in the Zoning Ordinance, and the "natural *features*" of the Property today. Applicant's Reply Br. at 4 n.3. In support, Applicant invokes the Zoning Ordinance's definition of "golf course" as being "improved with tees, greens, fairways, and hazards." Zoning Ordinance § 200-8. It essentially argues that because the Property's features are *improvements*, they cannot be "existing natural elements," so they are not natural resources and are not subject to the steep slope provisions of the Zoning Ordinance. Based on that distinction, Applicant disagrees with the Board's reliance on dictionary definitions of "natural resources."

Appellees respond that the Board properly rejected Applicant's

---

(c) Steep slopes with a grade of 15% to 25% shall have a protection rate of 75%.

(d) Steep slopes with a grade of greater than 25% shall have a protection rate of 85%.

R.R. at 179a, 182a (emphasis added).

A "natural resource" is "[e]xisting natural elements relating to land, water, air, plant and animal life, including but not limited to soils, geology, topography, surface and subsurface waters, wetlands, vegetation, and animal habitats." Section 200-8 of the Zoning Ordinance (definitions).

"Steep slopes" are "[a]reas of 3,000 square feet or greater which have a slope which is greater than 8% and which, because of the slope, are subject to higher rates of stormwater runoff and, therefore, erosion." *Id.*

substantive validity challenge to the steep slope provisions. They argue that the term "natural resources" used in Section 200-35(B) unambiguously does not distinguish between manmade and preexisting features of a property. In support they emphasize dictionary definitions of "natural resources" and decisions of this Court that have interpreted similar zoning ordinances to apply to manmade steep slopes.

We find the Zoning Ordinance unambiguous on this point. Section 200-35(B) makes clear that it applies to steep slopes only insofar as they constitute "natural resources"—a term the Zoning Ordinance defines as including "[e]xisting natural elements relating to land." Nothing about that definition distinguishes between elements that were built and elements that were not. Nor does it exclude improvements. The golf course features of the Property have indisputably "exist[ed]" for more than 30 years. When they began "existing" does not appear to be relevant to their status as "natural resources." To the extent Applicant would have the word "natural" support a distinction, we note that the plain meaning of that term when used in the phrase "natural resources" routinely *includes* environmental features made or altered by humans. *See Natural Resource,* BLACK'S LAW DICTIONARY (12th ed. 2024) (defining to include "[e]nvironmental features that serve a community's well-being or recreational interests, such as parks").

Relying on that common and approved usage, we have uniformly held the following: if a zoning ordinance "does not differentiate between man-made and natural steep slopes," then it unambiguously "regulate[s] all steep slopes of any origin." *Worth v. Solebury Twp. Zoning Hr'g Bd.*, (Pa. Cmwlth., No. 1983 C.D. 2007, filed September 8, 2008), slip op. at 7, 2008 WL 9401319;[8] *accord E. York Sch. Dist. v. Lower Windsor Twp. Zoning Hr'g Bd.*, (Pa. Cmwlth., No. 62 C.D. 2023,

---

[8] Unreported opinions of this Court filed after January 15, 2008, may be cited for their persuasive value. Pa.R.A.P. 126(b); 210 Pa. Code § 69.414(a).

14

filed Dec. 5, 2024), slip op. at 13, 2024 WL 4983567, (reversing lower court's "purported distinction between 'natural' and 'manmade' slopes" as being "not an actual ambiguity" and finding ordinance unambiguous); *DiSanto v. Bd. of Comm'rs of Susquehanna Twp.* (Pa. Cmwlth., No. 679 C.D. 2016, filed June 1, 2017), slip op. at 14, 2017 WL 2376522 ("The text is not ambiguous and . . . it explicitly does not distinguish between manmade and natural slopes.").

Imposing a natural/manmade distinction where there is none would create an impossible line-drawing problem for judges: "[H]ow would we then determine at what point a slope remains manmade and when in time it is to be considered to have become a natural part of the Property's topography?" *DiSanto*, slip op. at 14. Human changes to land are "visible today to anyone travelling across Pennsylvania's spectacular, rolling, varied terrain[,]" which "bears visible scars, too, as reminders of the past efforts of man to exploit Pennsylvania's natural assets." *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 976 (Pa. 2013). Whether a feature is natural or manmade is, as Judge Morganelli of Common Pleas aptly put it here, the "sort[] of thorny-bordering-on-philosophical question[]" best avoided by courts and left to legislation and policymaking. Common Pleas Op. at 17 n.4; *see DiSanto*, slip op. at 14. The Township's governing body obviously knows how to make policy judgments in its ordinances about whether manmade features should be regulated in a given context. It used the phrase "areas of natural (*i.e., not man-made*) steep slopes" in Section 4.11.11 of the SALDO, but not in the Zoning Ordinance. (Emphasis added.) We conclude that both the text of Section 200-35(B) and the Zoning Ordinance's definition of "natural resources" unambiguously apply to steep slopes regardless of their origin.

Second, Applicant argues the Property's slope areas are not "steep

15

slopes" at all. Applicant argues the areas do not meet the second prong of the definition of "steep slope" under Section 200-8 of the Zoning Ordinance because they are not "subject to higher rates of stormwater runoff and therefore erosion." It argues the Board and Common Pleas improperly disregarded that prong as being a statement of policy instead of a definitional requirement. Applicant emphasizes Walsh's testimony that the slopes on the Property are not subject to higher rates of erosion *than permitted by the Pennsylvania Department of Environmental Protection* and argues the Board capriciously disregarded that testimony. Applicant suggests that this part of the Zoning Ordinance is ambiguous because it does not include any measurable standard of runoff that would satisfy that second prong of the definition. Applicant proposes that we read the provision in its favor due to that lack of clarity.

In response, Appellees essentially adopt the Zoning Officer's and Common Pleas' view of the definition in Section 200-8: that the second prong of that definition, regarding runoff and erosion, is a statement of policy and does not limit the definition's scope. *See* R.R. at 739a; Common Pleas Op. at 24-25. Appellees argue that to qualify as a steep slope, an area need only be subject to heightened amounts of runoff, and there is no certain amount of runoff or erosion required. They further point out that the Board was free to reject Walsh's testimony that the slopes on the property will not be eroded.

We initially agree with Applicant about how to interpret the definition. The second phrase, requiring a higher amount of runoff, must have effect beyond being a statement of policy. *Delchester Devs., L.P. v. Zoning Hr'g Bd. of Twp. of London Grove*, 161 A.3d 1081, 1104 (Pa. Cmwlth. 2017) (citing 1 Pa. C.S. § 1921). But we also agree with Appellees that Applicant, and Walsh, looked beyond the

16

definitional standard. The definition requires only that a slope be subject to the potential for heightened runoff. It assumes that heightened runoff inherently places the slope at higher risk of erosion. It does not require a particular amount of erosion and it does not consider the surface cover of the slope. So to find this part of the definition satisfied, the Board need only have found that the slopes on the Property are the kind ordinarily subject to heightened runoff.

Walsh's testimony regarding the low risk of erosion does not undermine the Board's decision, for two reasons. First, Walsh's testimony on this issue, read as a whole, focuses on whether the Property *in general* would experience "erosion and increased stormwater runoff" because of the slopes. R.R. at 439a; *see id.* at 438a-41a. He opined that "the runoff would not exceed rates that would *deteriorate* a turf or grass surface covering." *Id.* at 502a (emphasis added). But that is not the definitional standard. The Zoning Ordinance asks only whether the steep slope areas themselves are subjected to heightened runoff. It does not allow consideration of the surface covering or other mitigating factors. Nothing about Walsh's testimony suggests that the slope areas on the Property are not inherently subject to greater runoff potential. Indeed, his testimony, by focusing on the need for turf grass to mitigate erosion, assumes that the slopes *are* subject to greater runoff potential. That is all the definition requires. Second, the Board apparently did not credit that testimony. The Board is free to reject testimony even if uncontradicted, and "it should remain a rare instance where a reviewing court disturbs an adjudication based on a capricious disregard of the evidence standard." *Metal Green Inc. v. City of Phila.*, 266 A.3d 495, 506, 515 (Pa. 2021) (Opinion Announcing the Judgement of the Court (OAJC)); *id.* at 525 & n.28 (Wecht, J., dissenting) (agreeing and emphasizing "rare"). The Board also considered Horvath's testimony. He

17

stated his view that being subject to heightened runoff potential is an inherent characteristic of all steep slopes, as mathematically defined based on slope percentage. R.R. at 573a-74a. The Zoning Officer gave the same testimony. R.R. at 739a. That testimony, which the Board credited, suggests that the Property's steep slope areas fall within the Zoning Ordinance's definition, like other steep slopes would. That supports the Board's determination here that the disputed areas are steep slopes, and we will affirm that determination, albeit on different grounds.

In its third argument, Applicant suggests that the steep slope provisions of the Zoning Ordinance should be construed *in pari materia* with those of the SALDO, which distinguishes manmade from natural steep slopes. We are not persuaded that they should be construed together, so this argument does not alter our conclusion that the steep slope provisions apply.

"Statutes or parts of statutes are *in pari materia* when they relate to the same persons or things or to the same class of persons or things." 1 Pa.C.S. § 1932(a). "Statutes *in pari materia* shall be construed together, if possible, as one statute." 1 Pa.C.S. § 1932(b). Appellees correctly identify two reasons that we should not read the ordinances together here. First, "the rule requiring *in pari materia* construction of statutes applies in instances of ambiguous statutory language." *Goodwin v. Goodwin*, 280 A.3d 937, 948 n.7 (Pa. 2022); *accord Rosario*, 294 A.3d at 349. We find no ambiguity, so we do not look outside the Zoning Ordinance. Second, the Zoning Ordinance and the SALDO regulate different things: zoning addresses permissible use, whereas the SALDO addresses subdivision and development. Two provisions of the Zoning Ordinance bolster this view. Section 200-4(D) says that provisions of the SALDO "*shall not be considered to be in conflict with the provisions of*" the Zoning Ordinance, which shall take precedence. And Section

18

200-65 says that when the Zoning Ordinance is "in conflict with other requirements of the Ordinances of the [Township], *the most restrictive of those imposing the highest standards shall govern*." The differences between the two ordinances are intentional and echo their different purposes, and we should not attempt to harmonize them.

## C. Offsite Improvements

Section 503-A(b) of the MPC states:

> No municipality shall have the power to require as a condition for approval of a land development or subdivision application the construction, dedication or payment of any offsite improvements or capital expenditures of any nature whatsoever or impose any contribution in lieu thereof, exaction fee, or any connection, tapping or similar fee except as may be specifically authorized under this act.

53 P.S. § 10503-A(b).[9] "Offsite improvements" are "capital improvements which are not onsite improvements[10] and that serve the needs of more than one development." Section 502-A of the MPC, 53 P.S. § 10502-A.[11]

Applicant argues that improvements the Board is requiring it to make to Jones Road under various SALDO provisions[12] are unlawful offsite

---

[9] Added by the Act of December 19, 1990, P.L. 1343.

[10] "Onsite improvements" are "[a]ll improvements constructed on the applicant's property, or the improvements constructed *on the property abutting the applicant's property necessary for the ingress or egress to the applicant's property,* and required to be constructed by the applicant pursuant to any municipal ordinance, including, but not limited to, the municipal building code, subdivision and land development ordinance, PRD regulations and zoning ordinance." 53 P.S. § 10502-A (emphasis added).

[11] Added by the Act of December 19, 1990, P.L. 1343.

[12] Section 4.06.9 of the SALDO requires that "streets adjacent to a development" must meet certain prescribed width requirements, and if they do not, "the developer is required to upgrade the street to meet these requirements by improving the road or paying a contribution to a

**(Footnote continued on next page…)**

improvements. Jones Road is not on the Property but is adjacent to the Property. Applicant argues that Jones Road is not necessary for ingress or egress to the Property, emphasizing that no access to the warehouse development will be allowed via Jones Road, and there will be signage specifically prohibiting trucks and through traffic from using Jones Road for access. Applicant acknowledges that on its initial submission and Site Plan 1, it proposed to create an emergency-only access point via Jones Road, but it removed that access point on its later submissions of Site Plan 2 and the Concept Plan. *See* Applicant's Reply Br. at 17. On that basis, Applicant argues Jones Road is not necessary for ingress or egress, so improvements to it are impermissible offsite improvements.

Appellees acknowledge that the plans do not depict any authorized access via Jones Road and no longer depict an emergency entrance there. But they emphasize Applicant's concession that some unauthorized access via Jones Road may still occur, which would be beyond Applicant's control. Appellees cite the development's size and traffic impact generally as a basis to find that the Zoning Officer's requirement of improvements to Jones Road is reasonable and not arbitrary.

We agree with Applicant's framing of the question here. The condition requiring improvements to Jones Road is permissible under Sections 503-A(b) and 502-A of the MPC only if those improvements are "onsite improvements," i.e., only if they are "necessary for the ingress or egress to the applicant's property." Walsh

Township Road Improvement Fund." Section 4.07.8.a of the SALDO states: "To ensure adequate sight distances, when street centerlines deflect more than one (1) degree, connection shall be made by horizontal curves," and prescribes minimum radii for curves. Section 4.07.9.a of the SALDO prescribes maximum and minimum grades for streets. Section 4.07.16 of the SALDO requires street signage to conform with U.S. Postal Service and Pennsylvania Department of Transportation (PennDOT) standards. Section 4.07.22 of the SALDO requires road striping per PennDOT standards.

testified that Jones Road is not necessary for ingress and egress. R.R. at 448a. His testimony about the potential emergency access via Jones Road, *see id.* at 499a, no longer supports the Board's determination because Applicant has removed that planned emergency access from the Concept Plan that is now the basis for its requested relief, *see id.* at 73a-85a. Thus, as currently constituted, we conclude that the Application does not make Jones Road necessary for ingress or egress to the Property, so improvements to Jones Road are therefore impermissible offsite improvements. The Board erred in concluding otherwise.

## D. Variance Relief

Section 910.2(a) of the MPC sets forth five criteria an applicant must show before the Board grants a variance, as follows:

> (1) That there are unique physical circumstances or conditions, including irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions peculiar to the particular property and that the unnecessary hardship is due to such conditions and not the circumstances or conditions generally created by the provisions of the zoning ordinance in the neighborhood or district in which the property is located.
>
> (2) That because of such physical circumstances or conditions, there is no possibility that the property can be developed in strict conformity with the provisions of the zoning ordinance and that the authorization of a variance is therefore necessary to enable the reasonable use of the property.
>
> (3) That such unnecessary hardship has not been created by the [applicant].
>
> (4) That the variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently

21

impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare.

(5) That the variance, if authorized, will represent the minimum variance that will afford relief and will represent the least modification possible of the regulation in issue.

53 P.S. § 10910.2(a). Applicant requests a dimensional variance. Although the above criteria apply to dimensional variances, the Pennsylvania Supreme Court has relaxed the standard for establishing hardship for dimensional variance purposes, as we have explained:

> Under *Hertzberg* [*v. Zoning Board of Adjustment of the City of Pittsburgh*, 721 A.2d 43 (Pa. 1998)], courts may consider multiple factors in determining whether the applicant established unnecessary hardship for a dimensional variance. These factors include the cost of the strict compliance with the zoning ordinance, the economic hardship that will result from denial of a variance, and the characteristics and conditions of the surrounding neighborhood.
>
> Although *Hertzberg* eased the requirements, it did not remove them. An applicant must still present evidence as to each of the conditions listed in the zoning ordinance, including unnecessary hardship. Where no hardship is shown, or where the asserted hardship amounts to a landowner's desire to increase profitability or maximize development potential, the unnecessary hardship criterion required to obtain a variance is not satisfied even under the relaxed standard set forth in *Hertzberg*.

*Tri-Cnty. Landfill, Inc. v. Pine Twp. Zoning Hr'g Bd.*, 83 A.3d 488, 520 (Pa. Cmwlth. 2014) (internal citations omitted).

Applicant requests the variance because of an asserted conflict between two Zoning Ordinance provisions. Section 200-35.B(12)(d) of the Zoning

Ordinance requires that woodlands[13] shall have a protection rate of 60% and a permitted clearance rate of no more than 40%. R.R. at 182a. Section 200-22.G-14.(1)(c)-(g) requires construction of a 100-foot-wide raised berm buffer yard in the front yard of any warehouse "along the entire length of the property line," "measured from the building lot line[14] of the proposed warehouse." R.R. at 306a-07a.

Applicant argues these two provisions irreconcilably conflict when applied to the Property. It explains that the berm must be located along the frontage of Jones Road, the Property's front yard per the Zoning Ordinance, which is also where most of the relevant woodland areas on the Property (i.e. those subject to the protection rate of Section 200-35.B(12)(d)) happen to be located. Thus, it argues, constructing the 100-foot-wide raised berm buffer yard in strict compliance with the Zoning Ordinance would force Applicant to exceed the permissible woodland disturbance rates.

To ameliorate that conflict, Applicant sought a 5% downward variance from the woodland preservation rate (i.e., to preserve 55% of the woodland, rather than 60%).[15] It claims the Board erred in denying that variance because Applicant successfully showed the variance criteria are met. Specifically, Applicant claims that the location of most of the woodland along the Property's Jones Road frontage

_____

[13] "Woodlands" are "areas of one acre or greater which contain an average of one or more trees measuring six inches in caliper or greater, per 5,000 square feet." Section 200-35.B(12)(b) of the Zoning Ordinance. R.R. at 182a.

[14] A "front lot line" is "[t]he line separating the lot from an existing street right-of way." Section 200-8 of the Zoning Ordinance. Section 200-29.L(l) of the Zoning Ordinance similarly requires that " [t]he buffer yard shall be measured from the property line or street right of way." R.R. at 315a.

[15] The percentage amount of the variance requested has shifted over time, but the parties now appear to agree that the present request is for a 5% variance. *See* R.R. at 772a, 778a-79a (20% variance); Applicant's Br. at 19-20; Board's Br. at 35; Township's Br. at 5, 37.

23

is unique to the Property and presents a hardship, and that Applicant did not create that hardship because it did not choose the woodlands' location. Applicant disputes the Board's conclusion that the variance could be reduced or eliminated if Applicant were to design a smaller warehouse for relatively less profit. Applicant points out that even if the warehouse were reduced to a tiny fraction of its current size, the 100-foot berm could not shrink with it—the berm would still need to be built in the same location (along the Jones Road frontage) because, per the Ordinance, it must be measured from the street or property line, not from the building. So it would still be impossible to satisfy the woodland protection and berm provisions together, regardless of the size of the warehouse. For the same reason, Applicant argues the 5% deviation is the minimum variance that would afford relief, because no other changes to the project's design can allow both provisions to be met.

Appellees first dispute that the provisions conflict, and thus they dispute any hardship. They cite the Zoning Officer's interpretation of the Zoning Ordinance that would allow the 100-foot berm to "move" along with the size of the building, rather than necessarily being measured from Jones Road. *See* R.R. at 739a-40a. The Zoning Officer based that interpretation on the definition of "front yard," which is the entire area between the building and the front lot line. On that view, if Applicant proposed a smaller warehouse, the berm could be built "behind" the existing woodlands, which would still be within the front yard, but not adjacent to Jones Road, where the woodlands principally are. That move would preserve enough woodlands and no variance would be needed. Appellees thus view the requested variance as being motivated by profit maximization, not actual hardship. Appellees also argue Applicant has essentially created the hardship because it was aware of the woodlands' location when it purchased the Property. Finally, they

24

emphasize the comments from members of the public at the Board hearings regarding the fourth variance criterion (character of the neighborhood / public welfare).

We agree with the Applicant that these two Zoning Ordinance provisions cannot both be met on this particular Property. Appellees attempt to explain away the hardship by interpreting the Zoning Ordinance to allow the 100-foot berm to be constructed essentially anywhere between Jones Road and the proposed warehouse. But that is not the appropriate interpretation of the Zoning Ordinance. The Ordinance requires the 100-foot berm to be "measured from the building lot line," not from the structure. R.R. at 306a-07a. Consistent with that, Section 200-29.L(l) of the Zoning Ordinance requires buffer yards to be "measured from the property line or street right of way." *Id.* at 315a. The Zoning Officer's interpretation, on which Appellees rely, ignores those clear provisions. Under the plain language of the Zoning Ordinance, Applicant cannot strictly comply with both the woodland provision and the berm provision.

Further, once one sets aside the Board's erroneous interpretation, the bulk of the variance criteria appear satisfied. The reason Applicant cannot comply with both provisions is that the Property itself is geographically distinctive—its existing woodlands are principally located along Jones Road, where the berm must go. Applicant introduced Walsh's competent testimony about that. *See* R.R. at 396a-400a. And Applicant did not place the woodlands where they are, so it did not create the hardship. Finally, the requested variance is the minimum necessary to afford relief. Walsh testified about his extensive efforts to reconfigure the plans to decrease the disturbance to the woodlands, so Applicant could request the least amount of relief. (R.R. 347a; R.R. 349a; R.R. 401 a; R.R. 770a- 775a). He ended

25

up with a deviation of less than 10% from the Ordinance's 60% woodland preservation standard. Appellees proffer no reason on appeal why that small deviation could be even smaller, taking for granted the proper interpretation of the Zoning Ordinance. Although the Board did not make any express credibility determinations as to the variance criteria, it did set forth its reasoning for the hardship, self-created hardship, and minimum variance criteria, including its interpretation of the Ordinance's berm provision. We conclude that that reasoning was erroneous, and that the Board could not reasonably have denied the variance request based on those criteria "in light of the manifest sufficiency of [the] evidence" regarding them. *Metal Green*, 266 A.3d at 525 (Wecht, J., dissenting).

Regarding one variance element, however—character of the neighborhood / public welfare—the Board was all but silent. It stated in conclusory fashion that "the *proposed development* is completely altering the essential character of the neighborhood." R.R. at 1025a (emphasis added). That conclusion does not address whether the *variance itself*, not the development as a whole, alters the character of the neighborhood. Nor does that conclusion appear supported by substantial evidence. The concerns the Board repeated in its conclusion here— regarding traffic, the size of the structure, and commercial use—are not obviously related to the woodland variance specifically. Walsh testified that the small variance would not harm the public welfare because the buffering and screening purposes of the Ordinance provisions would still be served. R.R. at 401a-02a. The Board did not address that testimony. It did not make credibility determinations or specific factual findings on the character of the neighborhood / public welfare requirement. The Board denied the variance on the other criteria discussed above, but that determination was in error. Those other elements will support grant of a variance,

and the question remains whether this last element should preclude a variance. Accordingly, we must remand, retaining jurisdiction, for the Board to adequately explain its determination on the criterion in subsection 910.2(a)(4) of the MPC specifically. It should make necessary credibility determinations and factual findings, decide whether it would deny the variance based on the character of the neighborhood / public welfare criterion alone, and then "set forth an adequate decisional foundation for" that decision so that we can review it. *Metal Green*, 266 A.3d at 517 (OAJC); *see also id.* at 517 n.18 (explaining preference for remand over reversal). *But see id.* at 527 & n. 39 (Wecht, J., dissenting) (preferring simple reversal). On remand, the Board should act on the present record without taking additional evidence.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the Board did not err in interpreting and applying the steep slope provisions of the Zoning Ordinance to the Property, so we will affirm Common Pleas' decision on that issue. But we conclude that the Board erred in requiring improvements to Jones Road, so we will reverse on that issue. We also conclude the Board erred in determining Applicant failed to meet the hardship and minimum variance criteria. However, the Board must still explain its determination regarding the character of the neighborhood / public welfare criterion before variance relief can be granted. Accordingly, we will vacate Common Pleas' decision as to the variance and remand with instructions for the Board to explain its decision on the last remaining variance factor, so that we may fully review the variance determination. *See, e.g., Colton Real Est. Corp. v. W. Conshohocken Zoning Hr'g Bd.*, 546 A.2d 1315, 1319 (Pa. Cmwlth. 1988)

(remanding and retaining jurisdiction for further factfinding by the zoning hearing board).

_____
MATTHEW S. WOLF, Judge

Senior Judge Leadbetter dissents.

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Water's Edge at Wind Gap, LLC    :
                Appellant    :
                              :
          v.            :    No. 279 C.D. 2024
                              :
Zoning Hearing Board of Moore    :
Township and Moore Township    :

## O R D E R

AND NOW, this 31st day of December , 2025, the March 4, 2024 order of the Court of Common Pleas of Northampton County (Common Pleas) is REVERSED in part and VACATED in part consistent with the accompanying Opinion. In all other respects, Common Pleas' order is AFFIRMED.

Further, this matter is REMANDED to Common Pleas with direction to remand to the Zoning Hearing Board of Moore Township (Board) for the Board to make necessary credibility determinations and factual findings, and to set forth an adequate decisional foundation for its decision, as specified in the accompanying opinion. All actions on remand shall be completed and the record shall be returned to this Court within 90 days after the date of this Order.

Jurisdiction retained.

_____
MATTHEW S. WOLF, Judge